**CHADBOURNE & PARKE LLP**
Counsel for the Petitioners
1301 Avenue of the Americas
New York, New York 10019
(212) 408-5215
Howard Seife
Francisco Vazquez
Eric Daucher

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- x
In re                                                          :
                                                               :
OIC RUN-OFF LIMITED                                            :   In a Case Under Chapter 15
                                                               :   of the Bankruptcy Code
                                                               :
Debtor in a Foreign Proceeding.                                :   Case No. 15-13054
-------------------------------------------------------------- x
In re                                                          :
                                                               :
THE LONDON AND OVERSEAS INSURANCE                              :   In a Case Under Chapter 15
COMPANY LIMITED                                                :   of the Bankruptcy Code
                                                               :
                                                               :
Debtor in a Foreign Proceeding.                                :   Case No. 15-13055
-------------------------------------------------------------- x
```

## VERIFIED PETITION UNDER CHAPTER 15 OF THE BANKRUPTCY CODE FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS, A PERMANENT INJUNCTION, AND RELATED RELIEF

Dan Yoram Schwarzmann and Paul Anthony Brereton Evans (the "Petitioners"),[1] as the duly authorized foreign representatives, as defined in section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of OIC Run-Off Limited (subject to a scheme of arrangement) ("Orion") and The London and Overseas Insurance Company Limited (subject to a

---

[1]    All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the amending scheme of arrangement contained in the Scheme Document, a copy of which is attached hereto as Exhibit "A."

scheme of arrangement) ("L&O," together with Orion, the "Companies"), by their United States counsel, Chadbourne & Parke LLP, file this verified petition (the "Verified Petition") in furtherance of the Official Form Petitions filed contemporaneously herewith, pursuant to sections 1504 and 1515 of the Bankruptcy Code, commencing cases under Chapter 15 seeking recognition of foreign main proceedings, and requesting a permanent injunction and related relief. In support thereof, the Petitioners respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Petitioners, as foreign representatives of the Companies, have commenced these Chapter 15 cases by filing this Verified Petition contemporaneously with, and accompanied by, all certifications, statements, lists and documents required under Chapter 15 and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). As set forth below, and in (i) the Declaration of Joseph Bahlsen Bannister, English legal counsel to the Companies dated November 16, 2015 (the "Bannister Declaration"), and (ii) the Statement of Foreign Representative as required by section 1515(c) of the Bankruptcy Code accompanying this Verified Petition:

(a)      a foreign proceeding in respect of each of the Companies was duly commenced in England;

(b)      the Companies' registered offices are in England;

(c)      the Companies are incorporated in England and Wales;

(d)      the Companies' centers of main interests are in England;

(e)      the Companies carry out nontransitory economic activity in England;

(f)      the Companies are eligible to be debtors under section 109(a) of the Bankruptcy Code;

(g)      the Petitioners are duly authorized to serve as foreign representatives, as defined by section 101(24) of the Bankruptcy

Code, and to petition for relief under Chapter 15 of the Bankruptcy Code; and

(h)    the Petitioners are entitled to the relief requested.

2.    The Companies are insurance and reinsurance companies incorporated in England and Wales.  In 1992, the Companies ceased writing new business and went into run-off. Thereafter, the Companies implemented the Original Scheme, a copy of which is attached hereto as Exhibit "B," which was sanctioned by the High Court of Justice of England and Wales (the "High Court") on March 5, 1997.  On March 6, 1997, this Court issued the Permanent Injunction Order under former section 304 of the Bankruptcy Code (the "Permanent Injunction"), a copy of which is attached hereto as Exhibit "C."   Pursuant to the Permanent Injunction Order, the Original Scheme was given full force and effect and made binding on and enforceable against all Scheme Creditors in the United States.  The Original Scheme became effective on March 7, 1997.

3.    The Original Scheme is a reserving scheme of arrangement, also known as a run-off scheme, pursuant to which the Companies' business is being run-off in the ordinary course.  Under the Original Scheme, Scheme Creditors are paid a percentage of their claims as and when they become established.  Those Scheme Creditors that have the benefit of a guarantee from the Companies' parent company (i.e., Qualifying ILU Policyholders) receive an additional payment(s) from the Companies up to the full amount of the Scheme Creditor's Qualifying Established Liabilities.  Protected Policyholders (defined below) receive payments in respect of their Established Liabilities from the PPB (defined below) or its successor in accordance with English law.

4.    The Companies have been in run-off for approximately 23 years and subject to the Original Scheme for approximately 18 years.  Initially, the Companies' run-off was

managed by the directors of the Companies, followed by the Provisional Liquidators. Following the Original Scheme coming into effect, the Companies' run-off has been managed by the Scheme Administrators. During the run-off, which at all times has been managed in London, the majority of the Companies' liabilities have been agreed. Most of the remaining liabilities are long-tail and may not crystallize into quantifiable claims for many years. The Petitioners, as Scheme Administrators, supported by the Creditors' Committee (defined below), have determined that the Original Scheme is no longer cost-effective or in the best interests of the Companies' creditors.

5.      The Petitioners, as Scheme Administrators, have concluded that it would be in the interests of the Scheme Creditors to implement the Amending Scheme, a crystallization scheme of arrangement, pursuant to which the Companies' remaining liabilities, subject to certain exceptions, will be estimated and paid the Payment Percentage. In addition to the Payment Percentage, those Scheme Creditors that are Qualifying ILU Policyholders will, subject to satisfying certain conditions, receive further payments under the Amending Scheme.

6.      By an order dated October 8, 2014 (the "Convening Order"), a copy of which is attached hereto as Exhibit "D," the High Court (i) granted leave to the Companies to convene meetings of Scheme Creditors for the purpose of considering and, if thought fit, approving the Amending Scheme (the "Meetings"), and (ii) confirmed that the Petitioners are the foreign representatives for the purpose of filing petitions for an order under Chapter 15 of the Bankruptcy Code granting recognition to the proceedings before the High Court in connection with the Amending Scheme (the "English Proceedings"), enforcing the Amending Scheme in the United States and additional relief.

7.      In accordance with the Convening Order, the Meetings occurred on December 11, 2014.  During the Meetings, the requisite majorities of each class of Scheme Creditors of the Companies voted in favor of the Amending Scheme.  Accordingly, the Petitioners submitted the Amending Scheme to the High Court for sanction.  By order dated October 29, 2015 (the "Sanction Order"), a copy of which is attached hereto as Exhibit "E," the High Court sanctioned the Amending Scheme.  The Amending Scheme will become effective, and thereby binding on all Scheme Creditors of the Companies wherever located, upon delivery of the High Court's order sanctioning the Amending Scheme to the Registrar of Companies in England and Wales (the "Registrar").[2]

8.      By this Verified Petition, the Petitioners seek an order of this Court, substantially in the form of the proposed Order Granting Recognition of Foreign Main Proceedings, a Permanent Injunction and Related Relief (the "Proposed Order"), a copy of which is attached hereto as Exhibit "F": (i) granting recognition of the English Proceedings; (ii) enforcing the Amending Scheme in the United States; and (iii) granting any other relief necessary to ensure the effective implementation of the Amending Scheme in the United States.

9.      This Verified Petition satisfies all of the requirements set forth in section 1515 of the Bankruptcy Code and the Companies are eligible to be debtors under section 109(a) of the Bankruptcy Code.  Because the relief requested herein is necessary to give effect to the Amending Scheme, the relief requested is appropriate under Chapter 15 of the Bankruptcy Code.

---

[2]   This Court's issuance of an order enforcing the Amending Scheme in the United States in a form satisfactory to the Petitioners is a condition precedent to the implementation of the Amending Scheme.  Therefore, delivery of the Sanction Order to the Registrar will only occur if and when this Court issues an order substantially in the form of the Proposed Order.

Granting the relief requested, including enforcement of the Amending Scheme in the United States, is consistent with the goals of international cooperation and providing assistance to foreign courts, embodied in Chapter 15 of the Bankruptcy Code. Further, the relief requested is consistent with the relief afforded by the Court in other ancillary proceedings and cases involving foreign insurance companies, both under former section 304 and Chapter 15 of the Bankruptcy Code.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the "Amended Standing Order of Reference" of the United States District Court for the Southern District of New York (Preska, Loretta C.J.), dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

11.     Venue is properly located in this District pursuant to 28 U.S.C. § 1410.

## THE COMPANIES

**A.**      **Orion**

12.     Orion was incorporated in England and Wales on April 30, 1931 under the Companies Act 1929 as a private company limited by shares with the name Ralli Brothers Insurance Company Limited. Its name was changed first to The Orion Insurance Company Limited on January 16, 1940, then to The Orion Insurance Company plc on December 22, 1981 when it was re-registered as a public limited company, and finally to its present name on March 30, 1998 when it was re-registered as a private company limited by shares. Orion is a subsidiary of Nationale-Nederlanden Overseas Finance and Investment Company ("NNOFIC"), itself a subsidiary of NN Group N.V. ("Nat-Ned"). Nat-Ned was previously a wholly owned subsidiary of ING Groep N.V. (formerly known as Internationale Nederlanden Groep N.V.) ("ING"), but

ING's interest in Nat-Ned has been reduced and now amounts only to 25.1 percent.  All of the shares in Orion are beneficially owned by NNOFIC. [3]

13.    As of the date it went into run-off, Orion was authorized to write insurance business in the United Kingdom under the Insurance Companies Act 1982.  Orion principally wrote marine, aviation, non-marine and personal lines business (including motor business).  Orion had smaller accounts in commercial and healthcare business.  Orion's business was written primarily in the United Kingdom, particularly in the London insurance market, but also through a Canadian branch, through agents in France and Belgium, and directly in Australia.

14.    Orion's current registered office is 10-18 Union Street, London, SE1 1SZ, England.

**B.    L&O**

15.    L&O was incorporated in England and Wales on April 25, 1893 under the Companies Acts 1862 to 1890 as a private company limited by shares with the name Hull Underwriters' Association Limited.  Its name was changed first to The London and Overseas Insurance Company Limited on July 25, 1956, then to The London and Overseas Insurance Company plc on December 23, 1981 when it was re-registered as a public limited company and finally to its present name on March 30, 1998 when it was re-registered as a private company limited by shares.  L&O is a subsidiary of Orion.  All of the shares in L&O are beneficially

---

[3]    To ensure that no shareholder resolution affecting the Companies could be passed without proper notice to the Scheme Administrators, 10.1% of the shares in each of the Companies was transferred to Serjeant's Inn Nominees Limited to hold as trustees for their respective shareholders with the voting rights in respect of those shares being exercisable by the Scheme Administrators.  The shares held by Serjeant's Inn Nominees Limited in Orion are all beneficially owned by NNOFIC.  The shares held by Serjeant's Inn Nominees Limited in L&O are all beneficially owned by Orion.

owned by Orion.[4]

16.    As of the date it went into run-off, L&O was authorized to write insurance business in the United Kingdom under the Insurance Companies Act 1982 and wrote marine, aviation, transit and property damage business.  L&O's business was written primarily in the London insurance market.

17.    L&O's current registered office is also 10-18 Union Street, London, SE1 1SZ, England.

### THE ILU GUARANTEES

18.    The Companies were members of the Institute of London Underwriters (the "ILU"), a trade association representing the interests of marine, aviation and transport underwriters from 1884 until 1998.  Most of the Companies' marine and aviation business was written through the ILU and was normally written on a co-insurance basis.  The Companies ceased being full members of the ILU on September 1, 1992.  Nevertheless, the Companies continue to receive the ILU's accounting and settlement information.

19.    Although not a formal condition of ILU membership, the ILU would typically request a guarantee from the parent of a member company for the benefit of policyholders with policies signed and issued, on behalf of the member company, through the ILU.  On March 20, 1969, when Orion acquired the entire issued share capital of L&O, Orion issued a guarantee to the ILU (the "Orion Guarantee"), which provided for certain payments to the ILU and its policyholders upon a default by L&O.

20.    Orion thereafter became a wholly-owned indirect subsidiary of ING

---

[4]    See footnote 3, supra.

Verzekeringen N.V., which has since merged with ING Insurance Topholding N.V. to become Nat-Ned, and ING became Orion's ultimate parent (though ING's interest in Nat-Ned has now been reduced to 25.1 percent).[5]  On August 28, 1970, when Nat-Ned acquired an indirect majority interest in Orion, Nat-Ned agreed, as a condition of the Companies' continuing membership in the ILU, to issue separate guarantees of Orion and L&O to the ILU (the "Nat-Ned Guarantee" and the "L&O Guarantee," respectively).  Both the Nat-Ned Guarantee and the L&O Guarantee provided for certain payments to the ILU and its policyholders upon a default by, in the case of the Nat-Ned Guarantee, Orion and, in the case of the L&O Guarantee, L&O.

21.    After the Companies ceased writing new business and went into run-off, disputes arose between Orion and the ILU over the validity of the Orion Guarantee and between Nat-Ned and the ILU over the validity of the Nat-Ned Guarantee and the L&O Guarantee.  These disputes were resolved by an agreement dated October 20, 1994 between Nat-Ned, Nationale-Nederlanden Internationale Schadeverzekering NV (another member of the ING group, now known as Nationale-Nederlanden Internationale Schadeverzekering SE), and the ILU (the "1994 Agreement").  Pursuant to the 1994 Agreement, the Orion Guarantee, the Nat-Ned Guarantee and the L&O Guarantee were discharged and replaced by a letter of credit issued for the benefit of the ILU (the "ILU Letter of Credit") to pay liabilities arising under insurance and reinsurance policies issued by the ILU on behalf of (i) L&O with an inception date on or after March 20, 1969 and (ii) Orion with an inception date on or after August 28, 1970 (collectively, the "Qualifying ILU Policies").  By a supplemental agreement dated November 20, 1996, NNOFIC became a party to the 1994 Agreement.  By agreement dated September 16, 2015 (the "2015

---

[5]    ING has agreed with the European Commission that ING's remaining shareholding in Nat-Ned will be disposed of before the end of 2016.

Agreement"), the ILU Letter of Credit was replaced with a guarantee from Nat-Ned in favor of the ILU (the "2015 Guarantee"). The 2015 Guarantee is subject to the same caps and limitations that were applicable to the ILU Letter of Credit. However, there is no longer any obligation to maintain a letter of credit for the benefit of the ILU.

## THE PROVISIONAL LIQUIDATION AND SECTION 304 PROCEEDING

22.     By the late 1980s and continuing into the early 1990s, the Companies experienced severe financial difficulties caused mainly by a continuing rise in asbestos and pollution claims, resulting from risks underwritten for United States policyholders and exposure to certain catastrophes, including the European storms of 1987 and 1990, Exxon Valdez (1989), Hurricane Hugo (1989) and the Iraqi invasion of Kuwait (1990). In 1992, the Companies ceased writing new business and went into run-off. On October 21, 1994, the ILU presented and filed the Winding-up Petitions with the High Court. On the same day, the High Court appointed the Provisional Liquidators of the Companies.

23.     On October 24, 1994, the Provisional Liquidators commenced ancillary proceedings under former section 304 of the Bankruptcy Code by filing verified petitions with this Court. By order of this Court, the Companies' ancillary proceedings were jointly administered as "In re Petition of Paul Anthony Brereton Evans and Richard Claude Boys-Stones, as Joint Provisional Liquidators of The Orion Insurance Company PLC, et al., Nos. 94-B-44968 (SMB) and 94-B-44969 (SMB)." On October 28, 1994, this Court issued a temporary restraining order enjoining, among other things, proceedings against the Companies or their property in the United States. Thereafter, this Court issued a preliminary injunction on substantially similar terms, which remained in effect until this Court issued the Permanent Injunction. On September 22, 1997, the Companies' ancillary proceedings were closed.

## THE ORIGINAL SCHEME

24.     The Original Scheme was sanctioned by the High Court on March 5, 1997. On March 6, 1997, this Court issued the Permanent Injunction, pursuant to which actions against the Companies or their property in the United States are enjoined.  In addition, the Permanent Injunction provides that the Original Scheme "shall be given full force and effect and shall be binding on and enforceable against all Scheme Creditors in the United States."  The Original Scheme became effective on March 7, 1997.  The Original Scheme and the Permanent Injunction remain binding and in effect.

25.     Pursuant to the Original Scheme, the Petitioners were appointed as Scheme Administrators.  In accordance with the Original Scheme, the Companies formed a committee of Scheme Creditors (the "Creditors' Committee") to oversee the implementation of the Original Scheme.  Under the Original Scheme, the Creditors' Committee was entrusted with providing the Scheme Administrators with their views on important issues relating to the Original Scheme, including the Payment Percentage and the implementation of the Valuation Option, described in greater detail below.

26.     The Original Scheme is a reserving scheme of arrangement, pursuant to which claims against the Companies are processed and established by the Scheme Administrators as they would be in the ordinary course of the Companies' business.   Under the Original Scheme, Scheme Creditors are paid a percentage of their claims (a "Payment Percentage") as they become Established Liabilities.[6]

---

[6]   The Companies entered into cross guarantees that result in every Scheme Creditor having the same net claims against both Companies.  Thus, all Scheme Creditors receive a common,

(Cont'd on following page)

27.    The initial Payment Percentage was set at 15% in September 1997 and, following consultation with the Creditors' Committee, has been increased in increments to its current level of 58%. Payments to Scheme Creditors in respect of the Payment Percentage by the Companies prior to December 31, 2013 totaled $622 million.

28.    Under the Original Scheme, each Scheme Creditor that is a Qualifying ILU Policyholder (i.e., a policyholder under a Qualifying ILU Policy) receives, in addition to the Payment Percentage, a "top-up payment" up to the full amount of that Qualifying ILU Policyholder's Qualifying Established Liability. The top-up payments are made by the Companies out of funds advanced by NNOFIC under the Claims Payment Loan Agreement dated November 20, 1996, as amended (the "CPLA").[7]

29.    In addition, the Original Scheme provided for payment to Protected Policyholders (as defined below). The Policyholders Protection Act 1975 (the "PPA") established the Policyholders Protection Board (the "PPB") to protect certain policyholders (the "Protected Policyholders") that might be prejudiced by the inability of an authorized insurance

---

(Cont'd from preceding page)

single Payment Percentage on their Established Liabilities under the Original Scheme, and the same will be the case under the Amending Scheme.

[7]    Pursuant to the 1994 Agreement, no funds need be drawn under the ILU Letter of Credit so long as funds are advanced by NNOFIC to the Companies under the CPLA. Similarly, under the 2015 Agreement, the 2015 Guarantee may not be called upon so long as funds are advanced by NNOFIC to the Companies under the CPLA. The amount of funds that may be borrowed by the Companies under the CPLA is limited to $450 million (the "Facility Limit"). If the Facility Limit is exhausted, an additional $3.5 million will be made available per year in perpetuity by NNOFIC to the Companies to pay Qualifying Established Liabilities. If the Amending Scheme becomes effective, a revised CPLA between NNOFIC, the ILU and the Companies will come into effect to reflect new terminology and administrative procedures for payments to be made under the Amending Scheme.

company conducting business in the United Kingdom to meet certain liabilities. Under the Original Scheme, the PPB agreed to pay a Protected Policyholder, subject to the PPB being satisfied that the claimant in question was eligible to receive compensation payments from the PPB pursuant to the PPA and subsequently the FSCS Rules, the Established Liability of that Protected Policyholder's claim up to the "Protected Percentage" (i.e., the maximum percentage of the claim that the PPB would be statutorily obliged to pay if the Companies had been placed in liquidation). In consideration for making such payment, the PPB would take an assignment of the Protected Policyholder's Scheme Liability (and be paid the relevant Payment Percentage in respect of that Scheme Liability), including the right to receive further payments from the Companies in respect of such Scheme Liability in the event that the Payment Percentage was increased. Following the effective date of the Original Scheme, the PPA was repealed and the PPB's statutory functions, rights and obligations in relation to the Companies and the Original Scheme were transferred to the Financial Services Compensation Scheme Limited (the "FSCS Scheme Manager").

30.    The Original Scheme included an option to permit the Scheme Administrators, with the agreement of the Creditors' Committee, to implement a process to determine all claims against the Companies (the "Valuation Option") by way of a crystallization or cut-off scheme of arrangement.[8]   Under the Original Scheme, the implementation of the

---

[8]    A crystallization or cut-off scheme of arrangement, also known as a valuation scheme, is designed to finalize the affairs of an insurer as soon as possible by implementing a mechanism to value and satisfy contingent claims and other claims of uncertain value against a company. This is typically done by the imposition of a bar date for the filing of claims against the company and the adoption of a methodology for valuing claims against the company. See Bannister Declaration ¶ 8.

Valuation Option was subject to creditor approval. The Scheme Administrators believe that it would be in the interests of Scheme Creditors, as a whole, to implement a crystallization scheme that is more detailed than the Valuation Option.[9]

## PROGRESS MADE UNDER THE ORIGINAL SCHEME

31.      The Petitioners (in their capacity as Scheme Administrators) have, for approximately 18 years, managed the Companies' run-off under the Original Scheme in London. The majority of the Companies' liabilities have now been determined in accordance with the terms of the Original Scheme. Most of the Companies' remaining liabilities are long-tail and, in the Petitioners' opinion, would likely not be determined for many years without the Amending Scheme.

32.      In recent years, the Petitioners have commuted some of the Companies' long-tail liabilities with Scheme Creditors. This has resulted in (i) an increase in the level of certainty with regard to the Companies' insurance reserves and (ii) increases in the Payment Percentage. Nevertheless, a large number of Scheme Creditors holding relatively small claims remain. Continuing the Original Scheme, however, is no longer a cost effective method of supporting further increases in the Payment Percentage. Moreover, relatively few reinsurance recoveries remain to be collected. Indeed, the Petitioners believe that it is likely that the Companies will not make any further significant reinsurance recoveries, other than from Lloyds Bank under the Lloyds Bank Agreement.

---

[9]   More detailed terms are required to reflect changes in the Companies' position and business practices since the implementation of the Original Scheme and the development of the Companies' creditor profile.

33.     As of December 31, 2013, the Companies had incurred over $300 million of run-off costs since they went into provisional liquidation in October 1994.  If the Companies remain in run-off under the Original Scheme, the Petitioners project that the run-off will continue beyond December 31, 2035.   The possible alternatives to continuing the run-off of the Companies under the Original Scheme are:

     a.  placing the Companies into insolvent liquidation;
     b.  activating the Valuation Option; or
     c.  implementing the Amending Scheme.

The Petitioners have concluded that the Amending Scheme is the best alternative.

34.     The Petitioners believe that the Amending Scheme will result in (i) a reduction of run-off costs,[10] (ii) an increase in the amount of assets available for distribution to Scheme Creditors in the form of an estimated higher Payment Percentage, and (iii) valuation of all Scheme Liabilities and payments to Scheme Creditors earlier than would otherwise be possible.   Under the Amending Scheme, a Scheme Liability generally refers to any liability of either or both of the Companies, other than certain liabilities to NNOFIC.

35.     As of the date hereof, the Petitioners estimate that the final Payment Percentage under the Amending Scheme will be 78% (higher than their estimate of 71% under the Original Scheme).   In addition, the Petitioners currently project that the majority of funds will be paid under the Amending Scheme by 2018, considerably earlier than currently anticipated under the Original Scheme.

---

[10]   The Petitioners estimate that, absent the implementation of the Amending Scheme, the total run-off costs for the period from 2014 to 2035 could reach $200 million (or more).  By introducing a mechanism to establish future liabilities, the Amending Scheme would reduce a significant portion of these future run-off costs.

## THE AMENDING SCHEME[11]

36.     Under the Companies Act 2006 (the "2006 Act"), a scheme of arrangement is a compromise or arrangement between a company and its creditors or any class of creditors to restructure their rights and liabilities.  It may be used to permit an orderly wind-up of all, or a portion of, a company's business.  Pursuant to the 2006 Act, a scheme of arrangement can only become effective and legally binding when (i) a majority in number representing not less than 75% in value of each class of creditors present and voting, in person or by proxy, vote in favor of the scheme of arrangement at a meeting or meetings specially convened with leave of the High Court; (ii) the High Court subsequently issues an order sanctioning the scheme of arrangement; and (iii) a copy of that order is delivered for registration to the Registrar.

37.     By application dated August 15, 2014 (the "Application for Leave"), the Petitioners requested an order from the High Court for leave under the 2006 Act to convene meetings of Scheme Creditors for the purpose of considering and, if thought fit, approving the Amending Scheme.  The Application for Leave and the subsequent application for an order from the High Court sanctioning the Amending Scheme are new proceedings, separate and distinct from the Original Scheme.  On October 8, 2014, the High Court granted the Application for Leave and issued the Convening Order.

38.     In accordance with the Convening Order, each of the Companies convened three separate meetings (collectively, the "Meetings")—one for Qualifying ILU Policyholders, one for Policyholders (other than Qualifying ILU Policyholders) in relation to their claims in

---

[11]   The following is a brief description of the Amending Scheme and its terms.  To the extent there is a conflict between this summary and the terms of the Amending Scheme, the Amending Scheme shall govern.

respect of Notified Outstanding Liabilities[12] and IBNR Liabilities,[13] and one for Policyholders (other than Qualifying ILU Policyholders) in relation to their claims in respect of Scheme Liabilities (other than Notified Outstanding Liabilities and IBNR Liabilities), Dual Scheme Creditors and Ordinary Creditors.   Each meeting was held on December 11, 2014 at 1 Embankment Place, London, WC2N 6RH, England.   During the Meetings, the requisite majorities of each class of Scheme Creditors voted in favor of the Amending Scheme. Accordingly, the Companies submitted the Amending Scheme to the High Court for sanction. On October 29, 2015, pursuant to the Sanction Order, the High Court sanctioned the Amending Scheme.

39.    The Amending Scheme will amend the terms of the Original Scheme.   The provisions of the Original Scheme will remain in effect, except as amended by the Amending Scheme.   In the event of any inconsistency between the terms of the Original Scheme and the terms of the Amending Scheme, the terms of the Amending Scheme will govern.

40.    The Amending Scheme provides, subject to certain limitations, for the crystallization and agreement of all remaining Scheme Liabilities, including contingent claims and other claims of uncertain value, based on currently available information and through

---

[12]   Under the Amending Scheme, a Notified Outstanding Liability is defined as "a claim arising under or in respect of an Insurance Contract for the amount payable by one or both of the Companies in respect of a loss which has been reported to or discovered by the Scheme Creditor and notified to one or both of the Companies but has not become an Agreed Liability or an Established Liability."

[13]   Under the Amending Scheme, an IBNR Liability is defined as "an incurred but not reported claim arising under or in respect of an Insurance Contract for the amount payable by one or both of the Companies in respect of a loss which has been incurred but has not been reported to or discovered by a Scheme Creditor plus the amount payable in respect of a general excess over Notified Outstanding Liabilities, to the extent that the current estimates of claims included as Notified Outstanding Liabilities may prove to be inadequate."

application of the Estimation Guidelines.  All Scheme Liabilities dealt with under the Amending Scheme will be valued initially as of December 31, 2013 (the "Valuation Date").

41.     As Scheme Liabilities are agreed, the Companies will pay the Payment Percentage to Scheme Creditors.  In addition to the Payment Percentage, those Scheme Creditors that are Qualifying ILU Policyholders will receive additional payments under the Amending Scheme.   Protected Policyholders will also receive payments under the Amending Scheme. When all amounts available for payment by the Companies under the Original Scheme and the Amending Scheme have been paid, the Companies will go into liquidation and the Original Scheme, as amended by the Amending Scheme, will be terminated.

42.     The Amending Scheme contains long-term stay provisions enjoining Scheme Creditors, subject to limited exceptions, from commencing or continuing actions against a Company, or its property, in any jurisdiction whatsoever, to establish the existence or amount of a Scheme Liability, except with the Scheme Administrators' consent.  A Scheme Creditor, however, is not enjoined from commencing a proceeding against a Company if the Company has failed to make a payment due to the Scheme Creditor under the Amending Scheme.

43.     The Amending Scheme is governed by English law.   Pursuant to the Amending Scheme, the High Court has exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which may arise out of any action taken or omitted to be taken under the Amending Scheme or in connection with the administration of the Amending Scheme.

## PROVISIONS FOR DETERMINING CLAIMS
## UNDER THE AMENDING SCHEME

44.     To achieve the objectives of the Amending Scheme (i.e., the crystallization and payment of Scheme Liabilities in an orderly and efficient fashion), the Amending Scheme

establishes a deadline (the "Bar Date") for Scheme Creditors to submit their claims.  The Bar Date is midnight (London time) on the first Business Day 240 days after the Amending Scheme becomes effective (the "New Effective Date").

45.    The Scheme Administrators will send, as soon as reasonably practicable after the New Effective Date, notice of the New Effective Date and the Bar Date to (i) all known Scheme Creditors, (ii) each person they believe may be a Scheme Creditor, (iii) the FSCS Scheme Manager, and (iv) each broker or other person known by the Scheme Administrators to have placed business with a Company.  This information will, wherever possible, also be advertised throughout the world in the same newspapers and publications in which notice of the Meetings was advertised and in other newspapers and publications that the Scheme Administrators determine to be appropriate.  A further letter with, where appropriate, details of the relevant Scheme Creditor's login ID and password for accessing its Claim Form on the Companies' website, www.oicrun-offltd.com (the "Website"), will be mailed within 60 days of the New Effective Date, after which the Scheme Creditor may amend its Claim Form using the Website.[14]

46.    Pursuant to the Amending Scheme, a Scheme Creditor (other than an Opt Out Qualifying ILU Policyholder, a Protected Policyholder or a Potentially Protected Policyholder) must complete and return its Claim Form to the Companies by the Bar Date.  If a Scheme Creditor agrees that the information contained in its Claim Form is accurate, it should confirm its

---

[14]    Within 60 days of the New Effective Date, the Scheme Administrators will make available on the Website a Claim Form for each Scheme Creditor known by the Companies.  The Claim Form will contain details of existing Scheme Liabilities that have been accepted by the Companies (i.e., the Scheme Creditor's Established Liabilities and Agreed Liabilities according to the Companies' records).

agreement by submitting the Claim Form to the Companies in accordance with the Amending Scheme. If a Scheme Creditor disagrees with any information in its Claim Form or wishes to make a claim that is not included in its Claim Form (e.g., for Notified Outstanding Liabilities or IBNR Liabilities), then the Scheme Creditor must revise its Claim Form to reflect its new claims or amendments to the information set forth in its original Claim Form and submit a revised Claim Form to the Companies before the Bar Date.

47.     The Scheme Administrators, in consultation with the Scheme Actuarial Adviser, will calculate the Gross Liabilities owed by the Companies to a Scheme Creditor from the information on the Scheme Creditor's Claim Form. The Scheme Administrators will apply the Estimation Guidelines to determine the value of any Notified Outstanding Liabilities or IBNR Liabilities.

48.     The Scheme Administrators will then seek to agree with each Scheme Creditor the value of the Gross Liabilities owed by the Companies to that Scheme Creditor, including Notified Outstanding Liabilities and IBNR Liabilities. The Scheme Administrators will also seek to reach an agreement with each Scheme Creditor on the value of any deductions to be made to that Scheme Creditor's claims, including (i) any discount to be applied for the time value of money in respect of the Scheme Creditor's Gross Liabilities; and (ii) any amounts owed by the Scheme Creditor to the Companies (an "Offset Amount").[15]

---

[15]  The Scheme Administrators will calculate the value of the Offset Amount (if any) to be applied to a Scheme Creditor's claim in consultation with the Scheme Actuarial Adviser and in accordance with the Estimation Guidelines. This may include the processing of the Companies' Gross Liabilities through the Companies' reinsurance systems to determine any reinsurance recoveries due to the Companies from that Scheme Creditor. The Scheme Administrators will seek to agree the value of the Companies' outwards claims against the

(Cont'd on following page)

49.     If the Scheme Administrators and a Scheme Creditor are unable to agree on the value of that Scheme Creditor's Gross Liabilities, Offset Amount, future payment pattern for discount for the time value of money in respect of those Gross Liabilities or any other matter (other than the Estimation Guidelines and the Risk Free Rate) that affects the amount of the Scheme Creditor's Net Liabilities within the period allotted by the Amending Scheme, the Scheme Administrators will refer the disputed matter to the Scheme Adjudicator.[16]

50.     Once the Gross Liabilities, Offset Amount, any discount for the time value of money in respect of Gross Liabilities and any other deduction have been determined, either by agreement or by adjudication under the Amending Scheme, the Scheme Administrators will confirm the amount of that Scheme Creditor's Net Liabilities in the form of a Net Statement. If the Scheme Creditor disputes the calculation of the Net Statement, the Scheme Administrators will refer this disputed matter to the Scheme Adjudicator.

51.     Pursuant to the Amending Scheme, the Scheme Adjudicator will review a disputed matter in accordance with the Dispute Resolution Procedure, a practical and cost-effective process for resolving any disputes regarding Scheme Creditors' claims in an

---

(Cont'd from preceding page)

relevant Scheme Creditor at the same time as they agree that Scheme Creditor's Gross Liabilities under the Amending Scheme.

[16]   The Amending Scheme provides for the appointment of a Scheme Adjudicator, who is independent of the Companies, in that he or she has had no previous employment with them and will not be remunerated on any form of contingency. The first Scheme Adjudicator will be Raji Bhagavatula of Milliman, Inc. In the event of a conflict of interest arising between the Scheme Adjudicator and the Companies or a Scheme Creditor, the Scheme Adjudicator may continue to act with the informed consent of the parties, or a suitably qualified alternate may be appointed by the Scheme Administrators in respect of the conflicted matter. Where the conflicted matter relates to a Qualifying Liability, the appointment of any alternate must also be approved in writing by NNOFIC and the ILU.

independent, fair and efficient manner, and issue a determination. In determining any disputed matter, the Scheme Adjudicator will apply the Estimation Guidelines. Under the Amending Scheme, the Scheme Administrators shall provide the Scheme Adjudicator with a copy of the Claim Form relating to the disputed matter and any supporting information provided by the Scheme Creditor. In addition, the Scheme Adjudicator will have access to the Companies' records and may request (i) additional information from the Scheme Creditor or the Scheme Administrators and (ii) a meeting with either of them to discuss the disputed matter.

52. The Scheme Adjudicator's determination in respect of a disputed matter will, insofar as the law allows, be binding and final on the Companies, the Scheme Administrators and the relevant Scheme Creditor (except in the case of fraud, arithmetical error, or the Scheme Adjudicator making an irrational determination). The Scheme Adjudicator will issue his determinations of disputed matters, together with, at his sole discretion, an appropriate explanation of the reasons for his determinations, no later than 890 days after the New Effective Date.

53. The Companies will make payments to a Scheme Creditor in respect of its Net Liabilities at the then current Payment Percentage.[17] In addition, (1) Qualifying ILU Policyholders will receive additional payments under the Amending Scheme and (2) Protected Policyholders will also receive payments under the Amending Scheme, each as described in greater detail below. The payments under the Amending Scheme will be in full and final settlement of all claims of a Scheme Creditor against the Companies.

---

[17] Under the Amending Scheme, the Payment Percentage will be periodically reviewed and may be increased as Net Liabilities are agreed.

**Qualifying ILU Policyholders**

54.     Under the Amending Scheme, as was the case under the Original Scheme, a Qualifying ILU Policyholder will receive 100% of its Established Liabilities resulting from payment of (i) the current Payment Percentage payable to all Scheme Creditors and (ii) a top-up payment up to the full amount of their Qualifying Established Liabilities.  Because their Qualifying Established Liabilities are already being paid out in full as they are determined under the Original Scheme, Qualifying ILU Policyholders will not benefit as materially as other Scheme Creditors from the expected increase in the Payment Percentage under the Amending Scheme.  Accordingly, the Amending Scheme provides that a Qualifying ILU Policyholder that does not opt out of the Amending Scheme will, subject to satisfying certain conditions, receive a Qualifying ILU Policyholder Premium in an amount equal to (i) the discount for the time value of money applied to the Qualifying ILU Policyholder's Notified Outstanding Liabilities and the IBNR Liabilities under its Qualifying ILU Policies and (ii) 10% of the undiscounted value of the Qualifying ILU Policyholder's Notified Outstanding Liabilities and IBNR Liabilities.

55.     The Qualifying ILU Policyholder Premium will be funded entirely by NNOFIC, not the Companies.  Consequently, the Payment Percentage paid to Scheme Creditors will be unaffected by the payment of the Qualifying ILU Policyholder Premium.  Moreover, because it is not funded from the CPLA, the payment of the Qualifying ILU Policyholder Premium will not affect the top-up payments to Qualifying ILU Policyholders.

56.     Under the Amending Scheme, a Qualifying ILU Policyholder may opt out of the crystallization and payment provisions contained in the Amending Scheme and have its Scheme Liabilities under Qualifying ILU Policies agreed and paid in accordance with the

Original Scheme.   An Opt Out Qualifying ILU Policyholder would receive 100% of its Established Liabilities, but would not receive the Qualifying ILU Policyholder Premium.

57.   The Scheme Administrators will only implement the crystallization and payment provisions of the Amending Scheme if no more than 30% by value of Qualifying Policyholders opt out of the Amending Scheme.   If the estimated value of the aggregate Net Liabilities of the Opt Out Qualifying ILU Policyholders exceeds 30% of the estimated value of the aggregate Net Liabilities of all Qualifying ILU Policyholders, the crystallization and payment provisions of the Amending Scheme will not take effect and all Scheme Creditors' claims will revert to run-off and will be administered in accordance with the Original Scheme.[18]

**Protected Policyholders**

58.   Protected Policyholders' and Potentially Protected Policyholders' claims will not be subject to automatic valuation and determination under the Amending Scheme.   Instead, Protected Policyholders and Potentially Protected Policyholders will be allowed to present their claims to the Scheme Administrators as they fall due in the ordinary course of business.

59.   The FSCS Scheme Manager has agreed to be bound by and to participate in the Amending Scheme if it becomes effective.   A payment will be made under the Amending Scheme by the Companies to the FSCS Scheme Manager to reflect the FSCS Scheme Manager's assumption of responsibility for making payments to Protected Policyholders and Potentially Protected Policyholders.   This payment will enable the FSCS Scheme Manager to meet the

---

[18]   The calculation as to whether the crystallization and payment provisions of the Amending Scheme will be implemented will be completed within 150 days of the Bar Date.

claims of any remaining Protected Policyholders and Potentially Protected Policyholders if and when it determines that such claims are entitled to protection and payment under English law.[19]

**Pre-1969 L&O Policyholders**

60.      Under the Amending Scheme, a Pre-1969 L&O Policyholder is defined as "a Scheme Creditor under an Insurance Contract entered into by L&O with an inception date before March 20, 1969 and whose claims in respect of that Insurance Contract are subject to the Lloyds Bank Agreement."  Under the Lloyds Bank Agreement, Lloyds Bank agreed to guarantee and indemnify the Companies for the claims of Pre-1969 L&O Policyholders.

61.      Based on the Pre-1969 L&O Policyholders' claim submissions and the Gross Liabilities of those claims subsequently agreed by the Companies, the Companies will, after deducting any recoverable reinsurance, seek payment from Lloyds Bank under the Lloyds Bank Agreement.  Should Lloyds Bank not pay the full amount requested, the Scheme Administrators will determine, in their absolute discretion and in consultation with the Creditors' Committee, whether Pre-1969 L&O Claims will revert to run-off and be determined and paid in accordance with the Original Scheme.[20]

62.      Upon reversion, Pre-1969 L&O Policyholders will receive the same Payment Percentage as all other Scheme Creditors in respect of their claims as their claims become

---

[19]   As of December 31, 2012, the Petitioners were aware of 32 claims by Protected Policyholders and Potentially Protected Policyholders that have not yet been agreed by the Companies.  These claims have an aggregate estimated value of approximately $741,000.  The Petitioners believe that the claims of Protected Policyholders and Potentially Protected Policyholders are *de minimis* and immaterial in both number and value in the context of the Amending Scheme.

[20]   The Scheme Administrators' decision as to whether the Pre-1969 L&O Policyholders revert to run-off will not affect the implementation of the crystallization and payment provisions of the Amending Scheme with regard to other Scheme Creditors.

Established Liabilities under the Original Scheme. They will not, however, receive the benefits of early determination of and payment on their future claims (i.e., Notified Outstanding Liabilities and IBNR Liabilities) under their Pre-1969 L&O Policies.

**Post-Bar Date Claims**

63.     Subject to certain limited exceptions under the Amending Scheme, a Scheme Creditor (other than an Opt Out Qualifying ILU Policyholder, a Protected Policyholder or a Potentially Protected Policyholder) that fails to submit a Claim Form on or before the Bar Date will only be entitled to payments from the Companies in respect of those Established Liabilities and Agreed Liabilities set forth on the Scheme Creditor's Claim Form provided by the Companies that (i) as of the Bar Date, remain to be paid to such Scheme Creditor, and (ii) are determined to be Net Liabilities due under the Amending Scheme.

64.     Under the Amending Scheme, the No Notice Adjudicator may permit (i) a Qualifying ILU Policyholder (that is not an individual) or (ii) an individual (whether or not that individual is a Qualifying ILU Policyholder) to submit a claim against the Companies after the Bar Date. In general, a Qualifying ILU Policyholder that can demonstrate that it neither knew, nor could reasonably be expected to have known, about the Amending Scheme and the Bar Date will be entitled to submit a claim after the Bar Date. In addition, an individual who can demonstrate that he acquired rights against the Companies by law or under the terms of the relevant policy with the Companies may submit a claim after the Bar Date, provided that such individual can demonstrate that (i) he neither knew, nor could reasonably be expected to have known, about the Amending Scheme before the Bar Date, (ii) no claim had arisen in his favor in connection with the relevant policy before the Bar Date, or (iii) before the Bar Date, he neither knew, nor could reasonably be expected to have known, that he had suffered significant injury.

An individual that satisfies the foregoing requirements is referred to as a "No Notice Individual Creditor."

65.     Qualifying ILU Policyholders that are allowed to submit their claims after the Bar Date and No Notice Individual Creditors must submit their claims so they are received by the Scheme Administrators by the earlier of (a) December 31, 2035 or (b) the date on which the Scheme Administrators give notice to the Companies that (1) all Priority Liabilities, Net Liabilities and Established Liabilities of the Opt Out Qualifying ILU Policyholders and, should the Pre-1969 L&O Claims revert to run-off, the Established Liabilities of the Pre-1969 L&O Policyholders, have been paid in full in accordance with the Amending Scheme or (2) there are no further Scheme Assets to be distributed under the Amending Scheme.  Such claims will be agreed or determined by the Scheme Administrators or by the Scheme Adjudicator, as the case may be, under the Amending Scheme.

66.     A Qualifying ILU Policyholder that is allowed to submit its claims after the Bar Date (to the extent they are Net Liabilities under the Amending Scheme) will receive the Payment Percentage from a provision (the "Post Bar Date Provision") set aside by the Scheme Administrators, in consultation with the Scheme Actuarial Adviser and subject to agreement with NNOFIC and the ILU.[21]  Any top up payment to such a Qualifying ILU Policyholder will be paid

---

[21]   The Amending Scheme provides for the appointment of a Scheme Actuarial Adviser, who must be a member of an actuarial body that is affiliated with the International Actuarial Association and have suitable experience.  The first Scheme Actuarial Adviser will be Mark Allen of PricewaterhouseCoopers LLP.  In the event of a conflict of interest arising between the Scheme Actuarial Adviser and the Companies or a Scheme Creditor, the Scheme Actuarial Adviser may continue to act with the informed consent of the parties, or a suitably qualified alternate may be appointed by the Scheme Administrators in respect of the conflicted matter.  Where the conflicted matter relates to a Qualifying Liability, the appointment of any alternate must also be approved in writing by NNOFIC and the ILU.

out of funds borrowed under the CPLA.  Any shortfall in the Post Bar Date Provision to pay the Payment Percentage to such a Qualifying ILU Policyholder will be paid out of funds borrowed under the CPLA.

67.    The claims of No Notice Individual Creditors (to the extent they are Net Liabilities under the Amending Scheme) and the costs of such claims, will be paid out of a provision set aside by the Scheme Administrators (the "Post Bar Date Individual Provision"). The amount of the Post Bar Date Individual Provision will be determined by the Scheme Administrators after the Bar Date on the basis that it is a fair and equitable estimate (taking into account the interests of both No Notice Individual Creditors and all other Scheme Creditors) of the amount that will be required to pay the claims of No Notice Individual Creditors submitted after the Bar Date and such related costs.[22]

68.    As the claims of a No Notice Individual Creditor are agreed or determined to be Net Liabilities under the Amending Scheme, they will be paid out of the Post Bar Date Individual Provision at the then current Payment Percentage.  Once the Post Bar Date Individual Provision is exhausted, further claims from No Notice Individual Creditors will not receive

---

[22]    The amount of the Post Bar Date Individual Provision determined by the Scheme Administrators will be subject to the review and agreement by NNOFIC and the Individual Claimant Representative, a representative appointed by the Scheme Administrators under the Amending Scheme to represent the interests of potential No Notice Individual Creditors.  In the event there is a dispute regarding the amount of the Post Bar Date Individual Provision, the matter will be referred to the Scheme Adjudicator for final determination.  The Scheme Adjudicator's determination will be final and binding on the Companies, the Scheme Administrators, NNOFIC, the Individual Claimant Representative and the No Notice Individual Creditors to the extent permitted by law and except in the case of arithmetical error or the Scheme Adjudicator making an irrational determination.

payment from the Companies, subject to the Scheme Administrators' power to increase the amount of the Post Bar Date Individual Provision under the Amending Scheme.

## THE COMPANIES' PROPERTY IN THE UNITED STATES

69.     The Companies have assets in the United States consisting of, among other things, funds in a bank account and reinsurance recoverables due from entities located in the United States, including in this District. The Scheme Administrators regularly make payments to creditors in the United States from funds periodically deposited into a bank account located in this District and anticipate using that same bank account to administer payments to be made in the United States under the Amending Scheme once it becomes effective.

70.     In addition, as of the date hereof, the Companies each have an interest in undrawn retainers with Chadbourne & Parke LLP, the Petitioners' United States counsel. In particular, each Company deposited $10,000 in a non-interest bearing client trust account with JPMorgan Private Bank in New York (the "Client Trust Account"). Such funds remain in the Client Trust Account as of the date hereof and are the property of the respective Companies. Pursuant to the Petitioners' arrangements with their counsel, Chadbourne & Parke LLP is only permitted to apply the funds in the Client Trust Account to outstanding invoiced amounts at the Petitioners' direction.

## STATUTORY BASIS FOR RELIEF REQUESTED

71.     Chapter 15 of the Bankruptcy Code was specifically designed to assist foreign representatives, such as the Petitioners, in the performance of their duties. One of its express objectives is the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor." 11 U.S.C. § 1501(a)(3).

72.     The relief sought herein is well within the scope of Chapter 15 and the criteria for recognition and the issuance of an injunction under Chapter 15 are satisfied under the facts of these cases.  Relief under Chapter 15 of the Bankruptcy Code is necessary to ensure that United States Scheme Creditors will be bound by the terms of the Amending Scheme and not be able to take action to their advantage and to the disadvantage of other Scheme Creditors, thereby potentially jeopardizing the implementation of the Amending Scheme.

73.     The Companies have Scheme Creditors located throughout the United States, including in this District.  Absent the relief requested, including enforcement of the Amending Scheme in the United States and injunctive relief, the Companies, their estates and creditors could be irreparably harmed.  If United States Scheme Creditors are permitted to ignore the Amending Scheme and seek alternative relief against the Companies, the Companies' assets could be depleted, thereby preventing a fair distribution to all creditors.  In addition, those creditors could gain an advantage over others, and there would be no orderly and uniform administration of the Companies' business and the assets of, and claims against, the Companies in one central forum.

74.     In contrast to the hardships described above, preservation of the Companies' assets for distribution in accordance with the terms of the Amending Scheme will not prejudice United States creditors.  To preserve assets for equitable distribution among Scheme Creditors, the Amending Scheme bars any proceeding against the Companies or their property, wherever located, seeking to establish the existence or amount of any Scheme Liability or to obtain payment of any Scheme Liability, unless (i) a Company has failed to perform its obligation to make payment in accordance with the Amending Scheme, or (ii) the Scheme Administrators consent to such proceeding.

75.    The entry of an order granting recognition to the English Proceedings and enforcing the Amending Scheme under Chapter 15 and granting additional appropriate relief is necessary to promote the goals of the Amending Scheme and ensure their effective implementation.  Indeed, absent the entry of an order recognizing the English Proceedings and enforcing the Amending Scheme in the United States, the Amending Scheme will not become effective despite approval by Scheme Creditors and the sanction by the High Court.

## RELIEF REQUESTED

76.    The Petitioners, as the foreign representatives of the Companies, seek entry of an order, substantially in the form of the Proposed Order granting the following relief as necessary to best advance the goals of the Amending Scheme and assure their effective implementation:

> (a)    recognition of the English Proceedings as foreign main proceedings, as defined in section 1502(3) of the Bankruptcy Code, pursuant to section 1517(b)(1) of the Bankruptcy Code; and

> (b)    all relief afforded upon recognition of a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code.

77.    In addition, the Petitioners seek additional assistance and relief, as authorized by sections 1507 and 1521 of the Bankruptcy Code, including, among other things:

> (i)    that the Amending Scheme (including any modifications or amendments thereto) shall be given full force and effect in the United States, and shall be binding on and enforceable against any person or entity that is a Scheme Creditor, including, without limitation, against such person or entity in its capacity as a debtor of a Company in the United States;

> (ii)    that all Scheme Creditors are permanently enjoined from taking any action in contravention of, or inconsistent with, the Amending Scheme;

> (iii)    that, except as otherwise provided in the Amending Scheme, all Scheme Creditors are permanently enjoined from attaching, seizing, repossessing, transferring, relinquishing or disposing of any property of either Company, or the proceeds thereof, in the United States;

31

(iv)    that, in accordance with the Amending Scheme, all Scheme Creditors are permanently enjoined from: (a) commencing or continuing any Proceedings (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever), including by way of counterclaim, against a Company, or any of its property in the United States, or any proceeds thereof, and seeking discovery of any nature against a Company; (b) enforcing any judicial, quasi-judicial, administrative judgment, assessment or order, or arbitration award and commencing or continuing any Proceedings (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever) or any counterclaim to create, perfect or enforce any lien, attachment, garnishment, setoff or other claim against a Company or any of its property in the United States, or any proceeds thereof, including, without limitation, rights under reinsurance or retrocession contracts; (c) invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state, or local law or regulation requiring a Company to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any Proceedings (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative action, proceedings or process whatsoever) and such statute, rule or requirement will be rendered null and void for Proceedings; (d) drawing down any letter of credit established by, on behalf or at the request of, a Company in excess of amounts expressly authorized by the terms of the contract or other agreement pursuant to which such letter of credit has been established; and (e) withdrawing from, setting off against, or otherwise applying property that is the subject of any trust or escrow agreement or similar arrangement in which a Company has an interest in excess of amounts expressly authorized by the terms of the contract and any related trust or other agreement pursuant to which such letter of credit, trust, escrow, or similar arrangement has been established; provided, however, no drawing against any letter of credit shall be made in connection with any commutation unless the amount has been agreed in writing with the Petitioners, the Scheme Administrators, or a Company, or permitted by the Amending Scheme or by further order of the Court;

(v)    that, nothing in the Proposed Order shall in any respect enjoin any police or regulatory act of a governmental unit, including a criminal action or proceeding;

(vi)    that, in accordance with the terms of the Amending Scheme, all persons and entities in possession, custody or control of property of a Company or the proceeds thereof, are required to turn over and account for such property or proceeds thereof to such Company or the Scheme Administrators;

(vii)    that all Scheme Creditors that are beneficiaries of letters of credit established by, on behalf or at the request of a Company or parties to any trust, escrow or similar arrangement in which a Company has an interest are required to: (a) provide notice to the Petitioners' United States counsel (Chadbourne & Parke LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Francisco Vazquez) of any drawdown on any letter of credit established by, on behalf or at the request of, a Company, or any withdrawal from, setoff against, or other application of property that is the subject of any trust or escrow agreement or similar arrangement in which a Company has an interest, together with information sufficient to permit the Scheme Administrators or such Company to assess the propriety of such drawdown, withdrawal, setoff or other application, including, without limitation, the date and amount of such drawdown, withdrawal, setoff or other application and a copy of any contract, related trust or other agreement

pursuant to which any such drawdown, withdrawal, setoff, or other application was made, and provide such notice and other information contemporaneously therewith; and (b) turn over and account to the Scheme Administrators or such Company for all funds resulting from such drawdown, withdrawal, setoff, or other application in excess of amounts expressly authorized by the terms of the contract, any related trust or other agreement pursuant to which such letter of credit, trust, escrow or similar arrangement has been established;

(viii)  that every Scheme Creditor that is a party to any Proceedings (including, without limitation, arbitration or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever) in which a Company is or was named as a party, or as a result of which a Scheme Liability may be established, is required to place such Company, the Scheme Administrators, and the Petitioners' United States counsel (Chadbourne & Parke LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Francisco Vazquez) on the master service list of any such Proceedings, and to take such other steps as may be necessary to ensure that such counsel receives: (a) copies of any and all documents served by the parties to such action or other legal proceeding or issued by the court, arbitrator, administrator, regulator or similar official having jurisdiction over such action or legal proceeding; and (b) any and all correspondence, or other documents circulated to parties named in the master service list;

(ix)  that nothing in the Proposed Order shall in any respect prevent the commencement or continuation of proceedings against any person, entity or insurer other than the Companies; provided, however, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than the Companies, such settlement or judgment shall not be binding on or enforceable against any of the Companies;

(x)  that, pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure shall be waived;

(xi)  that this Court shall retain jurisdiction with respect to the enforcement, amendment or modification of the Proposed Order, and requests for any additional relief in the Chapter 15 cases and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of this Court;

(xii)  that, except as otherwise provided in the Amending Scheme, all persons are permanently enjoined from commencing or continuing any Proceedings against the Companies, the Petitioners, the Scheme Administrators, or any of their respective directors, officers, agents, employees, representatives, financial advisers or attorneys (the "Scheme Parties"), or any of them with respect to any claim or cause of action, in law or in equity, which may arise out of the construction or interpretation of the Amending Scheme or out of any action taken or omitted to be taken by any of the Scheme Parties in connection with the administration of the Amending Scheme;

(xiii)  that the High Court has exclusive jurisdiction to hear and determine any suit, action, claim or proceeding and to settle any dispute that may arise out of the construction or interpretation of the Amending Scheme, or out of any action taken or omitted to be taken by any of the Scheme Parties in connection with the administration of the Amending Scheme; provided, however, that in relation to the determination of a Scheme Liability nothing in the Proposed

Order will affect the validity of provisions determining governing law and jurisdiction, whether contained in any contract between a Company and any of its Scheme Creditors or otherwise;

(xiv)    that no action taken by the Companies, the Petitioners, the Scheme Administrators, or any of their respective successors, directors, officers, agents, employees, representatives, advisers or attorneys, or any of them, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Amending Scheme, the Proposed Order, any further order for additional relief in the ancillary proceedings or cases filed under Chapter 15 of the Bankruptcy Code, or any adversary proceedings in connection therewith as this Court may make, will be deemed to constitute a waiver of the immunity afforded to the Companies, the Petitioners, the Scheme Administrators, or any of their respective successors, directors, officers, agents, employees, representatives, advisers or attorneys, pursuant to sections 306 or 1510 of the Bankruptcy Code;

(xv)    that, except as otherwise provided in the Amending Scheme, all persons are permanently enjoined from commencing or continuing any Proceedings against the Companies, the Petitioners, or any of their respective successors, directors, officers, agents, employees, representatives, advisers or attorneys (the "Pre-Scheme Parties"), or any of them with respect to any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken as of the New Effective Date by any of the Pre-Scheme Parties in connection with the Chapter 15 cases or in preparing, disseminating, applying for or implementing the Amending Scheme or the Proposed Order;

(xvi)    that the Companies and the Petitioners are authorized to transfer to the foreign proceedings subject to the Chapter 15 cases for distribution, pursuant to the Amending Scheme, any monies or assets of the Companies, which the Companies or the Scheme Administrators have or may hereafter recover; and

(xvii)    such other and further relief as this Court may deem just and proper.

78.    Granting the above relief and enforcing the Amending Scheme will ensure that the Companies' affairs are expeditiously resolved, consistent with the goal of Chapter 15 to provide assistance to foreign courts.

## NOTICE

79.    Pursuant to section 1517(c) of the Bankruptcy Code, a petition for recognition shall be decided at the "earliest possible time." By Application for Order Limiting Notice, Scheduling Hearing, and Specifying the Form and Manner of Service of Notice, the Petitioners will request, among other things, that this Court set the date for the hearing (the "Hearing") on recognition and relief at the earliest possible time after January 11, 2016.

80.     As soon as the Hearing is scheduled, the Petitioners will cause a copy of the Notice of Filing and Hearing on Petitions Seeking Recognition of Foreign Main Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code (the "Notice") to be sent by first-class mail to all Scheme Creditors and other parties in interest located in the United States.[23] By such notice, all United States parties in interest will be advised of the commencement of the Chapter 15 cases, the relief requested by this Verified Petition, the central documents filed with the Court respecting the Chapter 15 cases, as well as the date, place and time of the Hearing and the date, time and manner for lodging a response or motion respecting this Verified Petition, in accordance with the Bankruptcy Rules and the Local Rules of Bankruptcy Procedure. The Notice shall be sent so as to provide United States parties in interest at least 21 days' notice by mail prior to the Hearing, as required by Bankruptcy Rule 2002(q). The Petitioners also shall cause such notice in substantially the form of the Notice to be published expeditiously on the Website and in numerous newspapers and magazines in the United States, in accordance with the procedures set forth in the Application for Order Limiting Notice, Scheduling Hearing and Specifying the Form and Manner of Service of Notice.

---

[23] Copies of the Chapter 15 form petitions, this Verified Petition and all other pleadings, including: (i) the List submitted by the Petitioner pursuant to Bankruptcy Rule 1007(a)(4); (ii) the Statement of Foreign Representative required pursuant to 11 U.S.C. § 1515; and (iii) the Bannister Declaration will be provided upon request to the Petitioners' counsel.

## CONCLUSION

WHEREFORE, the Petitioners respectfully request that this Court enter an Order granting the relief requested herein substantially in the form of the Proposed Order annexed hereto and grant Petitioners such other and further relief as may be just and proper.

Dated:   New York, New York
         November 16, 2015

CHADBOURNE & PARKE LLP

By: */s/ Howard Seife*
    Howard Seife
    A Member of the Firm
    1301 Avenue of the Americas
    New York, New York 10019
    (212) 408-5215

    *Counsel for the Petitioners*

**CHADBOURNE & PARKE LLP**
Counsel for Petitioners
1301 Avenue of the Americas
New York, New York 10019
(212) 408-5215
Howard Seife
Francisco Vazquez
Eric Daucher

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- x
In re                                              :
                                                   :
OIC RUN-OFF Limited                                :   In a Case Under Chapter 15
                                                   :   of the Bankruptcy Code
                                                   :
Debtor in a Foreign Proceeding.                    :   Case No. 15-
-------------------------------------------------------------- x
In re                                              :
                                                   :
THE LONDON AND OVERSEAS INSURANCE                  :   In a Case Under Chapter 15
COMPANY LIMITED                                    :   of the Bankruptcy Code
                                                   :
                                                   :
Debtor in a Foreign Proceeding.                    :   Case No. 15-
-------------------------------------------------------------- x
```

I, Dan Yoram Schwarzmann, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States of America as follows:

I am the duly appointed foreign representative of OIC Run-Off Limited and The London and Overseas Insurance Company Limited (both subject to a scheme of arrangement).

I have the full authority to verify this Petition.

I have read the foregoing petition, and I am informed and believe that the factual allegations contained therein are true and accurate.

I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the information set forth above is, to the best of my knowledge, information and belief, true and correct.

Executed this 14th day of November 2015
in London, England


/s/ Dan Yoram Schwarzmann
Dan Yoram Schwarzmann