**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

In re

OIC RUN-OFF LIMITED

Debtor in a Foreign Proceeding.

:
:
:
:
:
:
:
:
:
:

In a Case Under Chapter 15
of the Bankruptcy Code

Case No. 15-13054

-------------------------------------------------------------- x

In re

THE LONDON AND OVERSEAS INSURANCE
COMPANY LIMITED

Debtor in a Foreign Proceeding.

:
:
:
:
:
:
:
:
:

In a Case Under Chapter 15
of the Bankruptcy Code

Case No. 15-13055

-------------------------------------------------------------- x

## DECLARATION OF JOSEPH BAHLSEN BANNISTER

Joseph Bahlsen Bannister, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury as follows:

1.     I am a solicitor of the High Court of Justice of England and Wales (the "High Court")[1] and have been since October 15, 1987. I am a partner with the law firm Hogan Lovells International LLP, English counsel to Dan Yoram Schwarzmann and Paul Anthony Brereton Evans (together, the "Petitioners"), as the Scheme Administrators of OIC Run-Off Limited (subject to a scheme of arrangement) ("Orion") and The London and Overseas Insurance Company Limited (subject to a scheme of arrangement) ("L&O," together with Orion, the "Companies"). I have been involved in advising numerous insolvent and solvent reinsurance and insurance companies on the preparation of schemes of arrangement under Part 26 of the Companies Act 2006 of the United Kingdom (the

---

[1]     All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Verified Petition under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Main Proceedings, a Permanent Injunction, and Related Relief to be filed contemporaneously herewith (the "Verified Petition").

"Companies Act") and its predecessor, section 425 of the Companies Act 1985 of the United Kingdom.

2.    This declaration contains matters that are statements of legal opinion and/or statements of fact. Where the matters stated in this declaration are statements of legal opinion, such statements represent my view of English law as a practicing lawyer. Where the matters stated in this declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this declaration are statements of fact that are not within my personal knowledge, they are derived from documents in the file records of the Companies and/or from information supplied to me by or on behalf of the Companies and are true to the best of my knowledge, information and belief.

3.    I submit this declaration in support of the petition filed contemporaneously herewith for recognition and relief made pursuant to Chapter 15 of the United States Bankruptcy Code (the "Bankruptcy Code") by the Petitioners, the duly authorized foreign representatives of the proceedings pending with respect to the Amending Scheme.

I. **SCHEMES OF ARRANGEMENT UNDER THE COMPANIES ACT**

4. The Companies Act contains numerous provisions related to the insolvency, reorganisation or adjustment of debt of English companies. Of particular relevance here, the Companies Act provides for schemes of arrangement, a well-established mechanism under English law that has been used regularly for dealing equitably with the run-off of insurance companies.

5. Under the Companies Act, a scheme of arrangement is a compromise or arrangement between a company and its creditors or any class of creditors to restructure their rights and liabilities. It may be used to permit an orderly closure of all, or a portion of, a company's business. A scheme of arrangement becomes legally binding on the company and on all of the creditors to whom it applies if:

(a) a majority in number representing not less than 75% in value of each class of creditors, present and voting in person or by proxy, vote in favor of the scheme of arrangement at meetings convened for such purpose with leave of the High Court of Justice of England and Wales (the "High Court");

(b) the High Court subsequently sanctions the approved scheme of arrangement; and

(c) an office copy of the order of the High Court to that effect is delivered to the Registrar of Companies in England and Wales.

6. There are no statutorily prescribed contents for a scheme of arrangement and it is therefore a flexible mechanism. The use of schemes of arrangement enables some perceived disadvantages of formal liquidation procedures (for insolvent insurance or reinsurance companies) or of an extended run-off (for solvent insurance or reinsurance companies) to be mitigated so as to achieve expedited valuation and payment of creditors'

claims and reduce the costs of managing the run-off of an insurance or reinsurance company's business.[2]

7.      A scheme of arrangement is a procedure that can be used to bind a company and its creditors to a proposed course of action for the benefit of all involved. A scheme of arrangement is roughly analogous to what I understand of a plan of reorganization under chapter 11 of the Bankruptcy Code.[3] A scheme of arrangement may be used by insurance or reinsurance companies with numerous policyholders to accelerate and conclude the run-off of certain or all of their business in a far shorter timescale than would otherwise be the case. A scheme of arrangement may contain simplified procedures for establishing and settling creditors' claims (whether in full or by way of distribution of a dividend out of the company's remaining assets).

8.      There are two types of schemes of arrangement that may be implemented for an insolvent insurance company: (i) a reserving scheme or (ii) a crystallization scheme. The purpose of a reserving scheme, also known as a run-off scheme, is to run off a company's business in the normal way, but to allow the payment of early dividends on claims agreed as the scheme progresses, subject to reserving sufficient assets to ensure that future claims can be paid at least at the dividend rate declared from time to time. The

---

[2]    Among the disadvantages of liquidation is that the Insolvency Rules 1986 (the "1986 Rules") provide for mandatory set-off on a principal to principal basis of cross-claims and for this purpose, and for the purpose of paying claims, all claims in foreign currencies must be converted into sterling at the official exchange rate prevailing on the date the company went into liquidation (Rule 4.91 of the 1986 Rules). This requirement can be inequitable if there are substantial overseas creditors and material movements in exchange rates occur. A further disadvantage of a compulsory winding-up is that a liquidator is obliged to pay the vast majority of funds under his control into the Insolvency Services Account (the "ISA") held at the Bank of England. ISA interest rates are low. Further, fees are charged for use of the ISA.

[3]    For an example of an English case in which the two types of proceedings appear to have been analogous, see Barclays Bank Plc v. Homan [1993] BCLC 680 at 685 (per Hoffman J.) in which the Court stated that "[t]he administration and chapter 11 have now got to the stage where the administrators, in consultation with the examiner, are formulating a scheme which can be approved as a plan of reorganisation under chapter 11 and simultaneously as a scheme of arrangement under section 425 of the Companies Act 1985."

purpose of a crystallization scheme, also known as an estimation, valuation or cut-off scheme, is to finalize the affairs of an insurer as soon as possible by implementing a mechanism to value and satisfy contingent claims and other claims of uncertain value against a company. This is typically done by the imposition of a bar date for the filing of claims against the company and the adoption of a methodology for valuing claims against the company, using actuarial techniques where there are long-tail liabilities.[4]

9.     Creditors have several opportunities to voice objections to a scheme of arrangement. As an initial matter, creditors may, after being notified about the scheme through a practice statement letter, raise objections or concerns regarding the scheme to the UK regulators or the proposed scheme administrators. Creditors may also raise objections regarding class composition with the High Court during the hearing held to consider an application for leave to convene meetings of creditors for purposes of voting on the scheme. Moreover, creditors can appear at the meeting of their class of creditors to ask questions, raise concerns regarding the scheme, and, should they choose to do so, ultimately vote against a scheme. Finally, scheme creditors may object to a scheme on a variety of grounds at the hearing during which the High Court will consider whether to sanction the scheme.

## II.     THE COMPANIES AND THEIR BUSINESS

10.     Orion is an insurance and reinsurance company that was incorporated in England and Wales on April 30, 1931. As of the date it went into run-off, Orion was authorized to write insurance business in the United Kingdom under the Insurance Companies Act 1982. Orion principally wrote marine, aviation, non-marine and personal lines business (including motor business). Orion had smaller accounts in commercial and

---

[4]   "Long tail" business should not be confused with "long term" business. In England, the former term refers to risks insured under policies which may not crystallize into quantifiable claims for several years. "Long term" business comprises life, annuity, pension and permanent health and other similar insurance. Schedule 1 of the FSMA 2000 (Regulated Activities) Order 2001.

healthcare business. Orion's business was written primarily in the UK, particularly in the London insurance market, but also through a Canadian branch, through agents in France and Belgium and directly in Australia.

11. L&O is an insurance and reinsurance company that was incorporated in England and Wales on April 25, 1893. As of the date it went into run-off, L&O was authorized to write insurance business in the United Kingdom under the Insurance Companies Act 1982 and wrote marine, aviation, transit and property damage business. L&O's business was written primarily in the London insurance market.

12. The Companies were members of the Institute of London Underwriters (the "ILU"), a trade association representing the interests of marine, aviation and transport underwriters from 1884 until 1998. Most of the Companies' marine and aviation business was written through the ILU and was normally written on a co-insurance basis. The Companies ceased being full members of the ILU on September 1, 1992.

13. I respectfully refer the Court to the Verified Petitions for a fuller discussion of the circumstances leading to these Chapter 15 cases and a description of the Companies, their business, the Original Scheme and the Amending Scheme.

## III.    THE ORIGINAL SCHEME

14. Although a number of substantial insurance businesses have failed within the United Kingdom in the past twenty-five years, it is rare for formal liquidation proceedings to be employed to wind-up such a company's affairs to effect a distribution to creditors. Prior to the administration procedure becoming available in 2002 to companies engaged in insurance business, it had become established practice in the United Kingdom for the High Court to appoint provisional liquidators over an insurance company to take such steps as may be appropriate to procure the approval of a scheme outside a formal liquidation (and otherwise to manage its affairs, business and property). This would occur in circumstances in which an administration order would have been made if that procedure

had been available.  See, e.g., Re English & American Insurance Company Ltd. [1994] 1 B.C.L.C. 649.  Indeed, that was the reason why the Companies were first placed into provisional liquidation.

15.     In 1992, the Companies ceased writing new business and went into run-off.  On October 21, 1994, the ILU presented and filed the Winding-Up Petitions with the High Court.  On the same day, the High Court appointed the Provisional Liquidators of the Companies.  Thereafter, the Provisional Liquidators, on behalf of the Companies, proposed the Original Scheme to address claims against the Companies.

16.     The Original Scheme was approved by the requisite majorities of Scheme Creditors on February 14, 1997 and subsequently sanctioned by the High Court on March 5, 1997.  The Original Scheme became effective on March 7, 1997 and remains binding and in effect.

17.     The Original Scheme is a reserving scheme of arrangement, pursuant to which claims against the Companies are processed and established by the Scheme Administrators as they would be in the ordinary course of the Companies' business.  Under the Original Scheme, Scheme Creditors are paid a percentage of their claims (a "Payment Percentage") as they become Established Liabilities.[5]  In addition to the Payment Percentage, those Scheme Creditors that are Qualifying ILU Policyholders receive additional payments under the Original Scheme.

18.     The Original Scheme included an option to permit the Scheme Administrators, with the agreement of the Creditors' Committee, to implement a process to determine all claims against the Companies (the "Valuation Option") by way of a

---

[5]   The Companies entered into cross guarantees that result in every Scheme Creditor having the same net claims against both Companies.  Thus, all Scheme Creditors receive a common, single Payment Percentage on their Established Liabilities under the Original Scheme, and the same will be the case under the Amending Scheme.

crystallization or cut-off scheme of arrangement. Under the Original Scheme, the implementation of the Valuation Option was subject to creditor approval. The Scheme Administrators believe that it would be in the interests of Scheme Creditors, as a whole, to implement a crystallization scheme that is more detailed than the Valuation Option. More detailed terms are required to reflect changes in the Companies' position and business practices since the implementation of the Original Scheme and the development of the Companies' creditor profile.

## IV.    THE AMENDING SCHEME

19.    The Petitioners, as Scheme Administrators, supported by the Creditors' Committee, have determined that the Original Scheme is no longer cost-effective or in the best interests of the Companies' creditors. The possible alternatives to continuing the run-off of the Companies under the Original Scheme are:

      a.  placing the Companies into insolvent liquidation;
      b.  activating the Valuation Option; or
      c.  implementing the Amending Scheme.

The Scheme Administrators have concluded that the Amending Scheme is the best of these alternatives. The Amending Scheme will result in (i) a reduction of run-off costs, (ii) an increase in the amount of assets available for distribution to Scheme Creditors in the form of an estimated higher Payment Percentage, and (iii) valuation of all Scheme Liabilities and payments to Scheme Creditors earlier than would otherwise be possible.

20.    The Amending Scheme will amend the terms of the Original Scheme. The provisions of the Original Scheme will remain in effect, except as amended by the Amending Scheme. In the event of any inconsistency between the terms of the Original Scheme and the Amending Scheme, the terms of the Amending Scheme will apply.

21.    The Amending Scheme provides, subject to certain limitations, for the crystallization and agreement of all remaining Scheme Liabilities, including contingent claims and other claims of uncertain value, based on currently available information and

through application of the Estimation Guidelines. All Scheme Liabilities dealt with under the Amending Scheme will be valued initially as at December 31, 2013.

22.     As Scheme Liabilities are agreed, the Companies will pay the Payment Percentage to Scheme Creditors. In addition to the Payment Percentage, those Scheme Creditors that are Qualifying ILU Policyholders will, subject to satisfying certain conditions, receive additional payments under the Amending Scheme. When all amounts available for payment by the Companies under the Original Scheme and the Amending Scheme have been paid, the Companies will go into liquidation and the Original Scheme, as amended by the Amending Scheme, will be terminated.

23.     The Amending Scheme contains long-term stay provisions enjoining Scheme Creditors, subject to limited exceptions, from commencing or continuing actions against a Company, or its property, in any jurisdiction whatsoever, to establish the existence or amount of a Scheme Liability, except with the Scheme Administrators' consent. A Scheme Creditor, however, is not enjoined from commencing a proceeding against a Company if the Company has failed to make a payment due to the Scheme Creditor under the Amending Scheme.

24.     Moreover, the Amending Scheme is governed by English law. Pursuant to the Amending Scheme, the High Court has exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute that may arise out of any action taken or omitted to be taken under the Amending Scheme or in connection with the administration of the Amending Scheme.

25.     Relief under Chapter 15 of the Bankruptcy Code is necessary to ensure that United States Scheme Creditors will not be able to take action to their advantage and to the disadvantage of other Scheme Creditors, thereby potentially jeopardizing the Amending Scheme. Indeed, the Bankruptcy Court's issuance of an order enforcing the Amending

Scheme in the United States in a form satisfactory to the Petitioners is a condition precedent to the implementation of the Amending Scheme and the New Effective Date.

26.    The Companies have assets in the United States consisting of, among other things, funds in bank accounts and reinsurance recoverables due from entities located in the United States, including in this District.  Moreover, the Companies have Scheme Creditors located throughout the United States, including in this District.  Absent the relief requested, including enforcement of the Amending Scheme in the United States and injunctive relief, the Companies, their estates and creditors could be irreparably harmed.  If United States Scheme Creditors are permitted to ignore the Amending Scheme and seek alternative relief against the Companies, the Companies' assets could be depleted, thereby preventing a fair distribution to all creditors.  In addition, those creditors could gain an advantage over others, and there would be no orderly and uniform administration of the Companies' business and the assets of, and claims against, the Companies in one central forum.

## IV.    THE AMENDING SCHEME PROCESS

27.    Under the Companies Act, a scheme of arrangement is a compromise or arrangement between a company and its creditors or any class of creditors to restructure their rights and liabilities.  It may be used to permit an orderly closure of all, or a portion of, a company's business.  Pursuant to the Companies Act, a scheme of arrangement can only become effective and legally binding when (i) a majority in number representing not less than 75% in value of each class of creditors present and voting in person or by proxy, vote in favor of the scheme of arrangement at a meeting or meetings specially convened with leave of the High Court; (ii) the High Court subsequently issues an order sanctioning the scheme of arrangement; and (iii) an office copy of that order is delivered for registration to the Registrar.

28.      Scheme Creditors were first notified of the proposed Amending Scheme by a letter dated January 20, 2014 (the "Practice Statement Letter") in accordance with the Vice Chancellor's Practice Statement (Companies: Schemes of Arrangement) (dated April 15, 2002).   The Practice Statement Letter provided notice that the Scheme Administrators had concluded that they, on behalf of the Companies, would propose the Amending Scheme and seek leave from the High Court to convene separate meetings of three different classes of Scheme Creditors for each Company for the purpose of considering and, if thought fit, approving the Amending Scheme.   The Practice Statement Letter refers the reader to the Companies' website, www.oicrun-offltd.com (the "Website"). The Companies have posted and maintained updated information on the Companies' run-off on the Website.   In addition, the Scheme Administrators placed advertisements reiterating the information found in the Practice Statement letter in a wide range of newspapers, journals and publications throughout the world, including the United States.

29.      By application dated August 15, 2014 (the "Application for Leave"), the Petitioners requested an order from the High Court for leave to convene meetings of Scheme Creditors under the Companies Act for the purpose of considering and, if thought fit, approving the Amending Scheme (the "Meetings").   The Application for Leave and the subsequent application for an order from the High Court sanctioning the Amending Scheme are new proceedings, separate and distinct from the Original Scheme.   No Scheme Creditor raised objections to the Application for Leave.   By an Order dated October 8, 2014 (the "Convening Order"), a copy of which is annexed to the Verified Petition as Exhibit "D," the High Court granted the Application for Leave and ordered the Meetings to be held on December 11, 2014.   The Convening Order also approved the proposed form of notice to Scheme Creditors and the means for distributing that notice by mail, publication and website posting, the implementation of which is described in paragraphs 30-32 below.

30.    In accordance with the Convening Order, a summary of the Amending Explanatory Statement (the "Short Form Explanatory Statement") was sent to Scheme Creditors also enclosing the following documents:

(a)    a paper copy of the notice convening the Meetings (the "Notice");

(b)    a map showing the location of the Meetings; and

(c)    voting and proxy forms for use at the Meetings.

The Short Form Explanatory Statement referred Scheme Creditors to the Website from which copies of the Amending Scheme and the more detailed Amending Explanatory Statement could be downloaded. Scheme Creditors were also made aware that they could request hard copies of the Amending Scheme from the Companies.

31.    The Scheme Administrators sent the Short Form Explanatory Statement and enclosures on or about October 8, 2014 by pre-paid first class mail or airmail (as appropriate) to (i) all potential and actual Scheme Creditors known by the Scheme Administrators[6] and (ii) each broker, intermediary or other person through which the Companies wrote business or acquired reinsurance known by the Scheme Administrators whose contact details are listed on the NADB. As of October 8, 2014, the NADB contained 68,435 names and addresses.

32.    Notice of the Meetings was posted on the Website and advertised in the newspapers, journals and publications listed on Exhibit "A" between October 15, 2014 and November 25, 2014 in accordance with the Convening Order. In addition, copies of all of the documents accompanying the Short Form Explanatory Statement were made available on the Website.

---

[6]    The contact details of all potential and actual Scheme Creditors known by the Scheme Administrators are listed on a database created by the Scheme Administrators (the "NADB").

33.     In accordance with the Convening Order, each of the Companies convened three separate Meetings on December 11, 2014 at 10:30 a.m. (English time)—one for Qualifying ILU Policyholders, one for Policyholders (other than Qualifying ILU Policyholders) in relation to their claims in respect of Notified Outstanding Liabilities and IBNR Liabilities, and one for Policyholders (other than Qualifying ILU Policyholders) in relation to their claims in respect of Scheme Liabilities (other than Notified Outstanding Liabilities and IBNR Liabilities), Dual Scheme Creditors and Ordinary Creditors.

34.     The Amending Scheme was approved by the requisite majorities of Scheme Creditors at the Meetings. Therefore, the Companies petitioned the High Court for an order sanctioning the Amending Scheme.

35.     The High Court has discretion to sanction a scheme of arrangement if it considers that it is proper and fair in all circumstances. In summary, the High Court must be satisfied:

(a)     that the classes of scheme creditors have been properly constituted;

(b)     that the meetings of scheme creditors to consider and vote on the scheme of arrangement were held in accordance with the High Court's order granting leave to convene such meetings;[7]

(c)     that the scheme of arrangement has been properly explained to scheme creditors so that they have been able to exercise an informed vote with respect to the scheme of arrangement;

(d)     that a simple majority in number representing three-quarters in value of those present and voting in person or by proxy of each class of scheme creditors has voted in favour of the scheme of arrangement; and

(e)     that the scheme of arrangement should be sanctioned. This latter element requires the High Court to consider

---

[7]  The High Court retains discretion to waive any immaterial departure from the directions as provided in the Convening Order.

> whether the scheme of arrangement is such that an intelligent and honest man, who is a member of the relevant class and acting in respect of his interest, might reasonably approve it.

Provided the High Court is satisfied that the foregoing five requirements have been met, the High Court will generally sanction a scheme of arrangement. In this instance, the High Court issued an order sanctioning the Amending Scheme on October 29, 2015. The Amending Scheme will become effective, and thereby binding on all Scheme Creditors of the Companies wherever located, upon delivery of the High Court's order sanctioning the Amending Scheme to the Registrar.

## V.    THE CHAPTER 15 CASES

40.    Under the auspices of the High Court and with the ancillary assistance of this Court, the ultimate goal of the Petitioners and the Companies is to implement the Amending Scheme and conclude the run-off of the Companies' business, sooner than would be the case if the Companies remained in run-off under the Original Scheme.

41.    The Companies appointed the Petitioners to administer the Amending Scheme and to act as its foreign representatives for the purpose of commencing cases and seeking relief under Chapter 15 of the Bankruptcy Code. Indeed, the Convening Order provides, in pertinent part, that the Petitioners "have been duly appointed as, and are, the foreign representatives of the pending proceedings concerning the Amending Scheme for the purpose of filing petitions for recognition of the pending proceedings and requesting orders enforcing the Amending Scheme and granting additional relief with the United States Bankruptcy Court under Chapter 15 of the United States Bankruptcy Code."

42.    The Bankruptcy Court's issuance of an order enforcing the Amending Scheme in the United States in a form satisfactory to the Petitioners is a condition precedent to the implementation of the Amending Scheme. Thus, the relief requested by the Petitioners under Chapter 15 of the Bankruptcy Code is necessary to give effect to the

Amending Scheme in the United States and will best assure an economical, expeditious and fair and efficient administration of the Amending Scheme that protects the interests of its Scheme Creditors and other interested entities, including the Companies.

43.     The relief sought is consistent with principles of comity and will reasonably assure the just treatment of the Scheme Creditors.  Moreover, Scheme Creditors in the United States will not be prejudiced or unduly inconvenienced in the processing of claims under the Amending Scheme.  Indeed, they will be treated like other similarly situated Scheme Creditors.  The relief sought by the Petitioners will ensure that the Companies' business will continue to be run-off in a unified manner and that Claims will be processed in an orderly and equitable manner and that the interest of the Scheme Creditors and other interested entities, including the Companies, are sufficiently protected.

I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America that the information set forth above is, to the best of my knowledge, information and belief, true and correct.

Executed on this 16 day of November 2015.

_____
Joseph Bahlsen Bannister

## Exhibit A

### List of Publications Where Notice of the Meetings Was Posted

| Publication | Date of Publication |
|---|---|
| 1. Aviation Week | 10/20/2014 |
| 2. Tradewinds | 10/21/2014 |
| 3. Maritime Market Magazine | Online – November 2014[1] |
| 4. Maritime Reporter and Engineering News | 11/14/2014 |
| 5. Maritime Professional | Online – November 2014[1] |
| 6. Maritime Journal | 11/25/2014 |
| 7. American Shipper Magazine | November - December 2014 edition |
| 8. Risk Magazine | 11/3/2014 |
| 9. The Insurance Receiver | Online – November 2014[1] |
| 10. Insurance Journal Magazine | 11/3/2014 |
| 11. Asbestos, Environmental and Toxic Torts (Andrews-Westlaw) | Asbestos 11/7/2014, Environmental 10/29/2014, Toxic 10/30/2014 |
| 12. Lloyd's List | 10/17/2014 |
| 13. The Financial Times (UK and International) | 10/15/2014 |
| 14. Wall Street Journal (International) | 10/16/2014 |
| 15. The International New York Times | 10/16/2014 |
| 16. The Times | 10/15/2014 |
| 17. The Scottish Sun | 10/15/2014 |
| 18. Post Magazine | 10/17/2014 |
| 19. Insurance Day | 10/17/2014 |
| 20. Wall Street Journal USA) | 10/16/2014 |
| 21. Business Insurance | 10/27/2014 |
| 22. The Washington Post | 10/24/2014 |
| 23. The New York Times | 10/16/2014 |
| 24. The Los Angeles Times | 10/16/2014 |
| 25. The San Francisco Chronicle | 10/17/2014 |
| 26. The San Jose Mercury News | 10/17/2014 |
| 27. The Dallas Morning News | 10/17/2014 |
| 28. The Houston Chronicle | 10/17/2014 |
| 29. The Fort Worth Star-Telegram | 10/17/2014 |
| 30. The Tampa Bay Times | 10/17/2014 |

---

[1] It was not possible to publish notice of the Meetings prior to the date of the Meetings in Maritime Market Magazine, Maritime Professional and Insurance Receiver because they are quarterly publications. Instead, a short banner was placed in November 2014 on their respective websites advising Scheme Creditors of the location and date of the Meetings and providing details of the Website where the notice of the Meetings could be viewed in full.

| Publication | Date of Publication |
|---|---|
| 31. The Orlando Sentinel | 10/17/2014 |
| 32. The Sun Sentinel | 10/17/2014 |
| 33. The Miami Herald | 10/17/2014 |
| 34. The Chicago Tribune | 10/17/2014 |
| 35. The Milwaukee Journal Sentinel | 10/17/2014 |
| 36. The Times-Picayune | 10/17/2014 |
| 37. New Orleans City Business | 10/17/2014 |
| 38. The Des Moines Register | 10/17/2014 |
| 39. The Gazette (Iowa) | 10/17/2014 |
| 40. The Quad Cities Times | 10/17/2014 |
| 41. The Iowa Falls Times Citizen | 10/17/2014 |
| 42. The Hartford Courant | 10/17/2014 |
| 43. The New Haven Register | 10/17/2014 |
| 44. The Connecticut Post | 10/17/2014 |
| 45. The Providence Journal | 10/17/2014 |
| 46. The Newport Daily News | 10/17/2014 |
| 47. The Bergen Record | 10/17/2014 |
| 48. The Asbury Park Press | 10/17/2014 |
| 49. The Beaumont Enterprise | 10/17/2014 |
| 50. The Advocate | 10/17/2014 |
| 51. The Columbia Star | 10/17/2014 |
| 52. The Pittsburgh Post-Gazette | 10/17/2014 |
| 53. The Florida Times-Union | 10/17/2014 |
| 54. The Atlanta Journal Constitution | 10/17/2014 |
| 55. The Cleveland Plain Dealer | 10/17/2014 |
| 56. The Tulsa World | 10/17/2014 |
| 57. The Richmond Times-Dispatch | 10/17/2014 |
| 58. USA Today | 10/16/2014 |
| 59. El Nuevo Dia | 10/17/2014 |
| 60. Pacific Daily News | 10/17/2014 |
| 61. Globe & Mail | 10/17/2014 |
| 62. La Presse | 10/17/2014 |
| 63. Les Echos | 10/17/2014 |
| 64. Le Parisien / Aujourd'hui en France | 10/17/2014 |
| 65. De Tijd | 10/17/2014 |
| 66. L'Echo | 10/17/2014 |
| 67. Bild | 10/17/2014 |
| 68. Frankfurter Allgemeine Zeitung | 10/17/2014 |
| 69. La Repubblica | 10/17/2014 |
| 70. NRC Handelsblad | 10/17/2014 |
| 71. De Volkskrant | 10/17/2014 |
| 72. El Pais | 10/17/2014 |
| 73. Australian Financial Review | 10/17/2014 |
| 74. New York Law Journal | 10/17/2014 |

| Publication | Date of Publication |
|---|---|
| 75. National Law Journal | 10/20/2014 |
| 76. The Irish News | 10/15/2014 |
| 77. The Belfast Newsletter | 10/15/2014 |
| 78. The Daily Record | 10/15/2014 |
| 79. South Wales Evening Post | 10/15/2014 |
| 80. Wisconsin State Journal | 10/17/2014 |